## NEBEKER ET AL. *v.* CUTSINGER ET AL.

PROMISSORY NOTE.—*Fraud in Procuring Signature.*—*Carelessness of Maker.*— *Rights of Innocent Indorsee.*—Where the maker of a promissory note, negotiable and payable at a bank in this State, was induced by the fraud and circumvention of the payee to sign his name to such note when he honestly supposed and believed that he was executing a paper of an entirely different character, and had no intention to sign a note;

*Held,* that the maker was liable to a *bona fide* endorsee for value, if he was guilty of negligence in failing to use reasonable care to inform himself of the contents of the paper so signed by him.

SAME.—When a man, who can without difficulty read, executes a negotiable note without reading it, trusting to the party to whom it is executed for a statement of its contents, or trusting to the reading of it by the latter, there being no substantial reasons shown for not reading it himself, he is guilty of negligence.

VERDICT.—*Special Findings.*—When the special findings of the jury, in answer to interrogatories, are inconsistent with the general verdict, judgment must be rendered in accordance with the special findings.

From the Marion Superior Court.

*W. W. Woollen, S. M. Cambern,* and *L. Nebeker,* for appellants.

*C. Byfield* and *D. Howe,* for appellees.

Worden, J.—This was an action by the appellants, as the holders, against Cutsinger, as the maker, and Drake, as the indorser, of a promissory note for the sum of five hundred dollars, payable six months after date at the Citizens National Bank of Indianapolis, with attorneys' fees.

Drake made default, and judgment was rendered against him; and, as to him, no question arises in the record.

Cutsinger answered:

1. Denial of the execution of the note.

2. Special denial of the execution of the note, setting out the circumstances.

3. Substantially the same as the second, with an averment of notice to the plaintiffs.

There were two more paragraphs of answer, but as the defences set up by them respectively were completely negatived by the answers of the jury to interrogatories propounded to them, which will be hereinafter considered, we need not further notice them. The first and second paragraphs of the answer only were sworn to. The defence rested upon these paragraphs. The first, as we have seen, was simply a denial of the execution of the note. The second we set out in full, in order to the development of the questions arising in the record. It is as follows:

" And said defendant, for second and further answer to said complaint, says that he admits the signing by him of a certain writing purporting to be his note, and so mentioned and described in said complaint. But defendant says that before and at the time he signed said writing, the payee of said pretended note, by his agents, had been and were negotiating and endeavoring to induce him to accept an agency for the sale, on commission, in Blue River and Franklin townships, in Johnson county, Indiana, of a certain patent machine, styled by said payee, ' Drake's Horse Hay Fork and Hay Carrier;'

that said payee, by his agents aforesaid, then and there exhibited to the defendant an agreement partly printed and partly written, substantially like that which is hereto annexed and made part hereof, marked 'Exhibit A,' except that the agreement first mentioned did not contain the words, 'on the following condition, viz., that the said party of the second part has this day given a note on six months' time, for five hundred dollars; said note is for this lease;' that it was further agreed by and between the defendant and said payee, but whether incorporated in the agreement first exhibited to him or not he can not say, that defendant should pay to said payee, as a commission upon each and every one of said machines sold by him, the sum of five dollars; that said payee, by his agents aforesaid, then and there also falsely and fraudulently represented to defendant that it was necessary for him to sign an order to procure the shipment to him of such machine or machines as might be sent to him to sell on commission as aforesaid, and then and there exhibited to him an order partly written and partly printed, of the size and similitude of the writing purporting to be the defendant's note ; the said payee, by his agents aforesaid, then and there also falsely and fraudulently and for the purpose of inducing the defendant to sign said paper purporting to be his note, read the same to him as though the same was an order as aforesaid, and a duplicate of the order exhibited to him, and also falsely and fraudulently read to him the agreement marked 'Exhibit A,' as though the same was a duplicate of the agreement first exhibited to him ; and by these and various other fraudulent tricks, devices, and stratagems, induced defendant to believe that the paper purporting to be his note was in fact an order as aforesaid; that defendant is a farmer by profession, and an uneducated man, and wholly unlearned in law and unused to executing written contracts ; that relying upon the false and fraudulent representations, and being deceived by the artifices of said payee and his agents as aforesaid, and believing that the paper purporting to be his note was an order as aforesaid, and that the agreement marked 'Exhibit A' was a duplicate of the one

first exhibited to him, and without any knowledge or notice whatever to the contrary, and without any fault or negligence on his part, he was induced to, and did sign the said paper purporting and pretended to be his note. And so the defendant says that he never executed, nor authorized any one for him to execute the pretended note referred to in the complaint, in manner and form as therein alleged."

The following is exhibit " A," mentioned in the answer:

" Memorandum of agreement made and entered into this day by and between James B. Drake, of Indianapolis, Indiana, party of the first part, and George Cutsinger, of Amity, township of Franklin, county of Johnson, and State of Indiana, party of the second part: Witnesseth, that whereas said party of the first part is the owner and proprietor of a machine known as ' Drake's Horse Hay Fork and Hay Carrier;' and whereas the party of the first part has a contract with Sinker, Davis & Co., of the Western Machine Works, Indianapolis, Indiana, to manufacture and furnish said machines to said party of the first part and his agents at the price as per price list below given; now this indenture witnesseth that the said party of the first part has this day leased unto the party of the second part the townships of Franklin and Blue River, county of Johnson, and State of Indiana, for the sale of his Horse Hay Forks and Hay Carriers for the term of five years from this date, on the following conditions, viz.: That the said party of the second part has this day given a note on six months' time for five hundred dollars; said note is for this lease and one machine, to be shipped to Amity, for the said party of the second part (free of charge except freight). And the party of the first part agrees to furnish the party of the second part, at the Western Machine Works at Indianapolis, Indiana, all of said forks and carriers for sale in said territory, at wholesale prices, as per price list here given, to wit:

" Wholesale price to agents:

Fork and pulleys,    -    -    -    -    -    -    $5.00
Carriers with ends of rod,    -    -    -    -    -    5.00

" Retail price to agents:

Fork and pulleys,    -    -    -    -    -    -    $15.00

Carrier with ends of rod,    -    -    -    -    -    20.00

"And the party of the second part agrees to notify the party of the first part if any unauthorized person or persons sell, or offer for sale, any of said machines. And the party of the second part admits that the sole and only inducement which has influenced or induced him to take this lease and make this contract is from a personal examination of said improvements, and what he deems their merits, wholly uninfluenced by any statements or representations made by the agent or agents of the party of the first part. And it is understood by the party of the second part that no agent or agents of the party of the first part are authorized, but are strictly forbidden, to make any misrepresentations in reference to the merits of said machine. And the party of the second part further acknowledges that he has carefully examined this agreement, and fully understands its conditions.

"In witness whereof, we have hereunto subscribed our names and affixed our seals this 26th day of June, A. D. 1872.

                                    "JAMES B. DRAKE, (Seal).

                                    "GEORGE CUTSINGER, (Seal).

"Witness, H. G. FOSDICK.

"I, James B. Drake, do hereby agree with George Cutsinger that if he does not make five hundred dollars out of the sale of Drake's Horse Hay Fork and Hay Carrier, in accordance with the above lease and agreement, I will re-purchase said lease of him at the same price he gave, by his dividing equally the profits on what he has already sold, or I will give him more time to sell.

                                    "JAMES B. DRAKE, (Seal).

"Witness, H. G. FOSDICK."

There was a reply in denial of this paragraph of answer, and also a special paragraph not necessary to be noticed in this opinion.

Issues were formed, and the cause was tried by a jury, who found a general verdict for the defendant Cutsinger, and

returned the following answers to interrogatories propounded to them, viz.:

" 1. Did the defendant George Cutsinger sign the note sued on in this cause?

" Ans. Yes.

" 2. Does it appear from the evidence in this cause that the plaintiffs purchased the note sued on for a valuable consideration before due?

" Ans. Yes.

" 3. Does it appear from the evidence in the cause that at the time of said purchase plaintiffs had notice or knowledge of any defence to said note, which defendant has alleged?

" Ans. No.

" 4. Was the defendant Cutsinger, at the time of signing said note, able to read the same?

" Ans. Yes.

" 5. Did said defendant, at the time of signing said note and during the transaction, execute an instrument purporting to be a duplicate of a contract for the sale of Drake's Horse Hay Fork and Hay Carrier, which duplicate went into the hands of James B. Drake, the payee, or his agent?

" Ans. Yes.

" 6. Was there contained in the body of such instrument a statement sufficient to apprise any one who read such instrument that a note was being given, or that one of the instruments which was being or had been executed in said transaction, was a note answering the description of the note sued on as to date, time, and amount?

" Ans. Yes.

" 7. Was the defendant Cutsinger capable of reading said instrument without extraordinary difficulty?

" Ans. Yes.

" 8. Did said defendant read such instrument at the time of such transaction?

" Ans. In part.

" 9. Did said defendant, at the time of signing said note or during said transaction, execute a contract giving him, the said

defendant, the right and agency to sell said machines, being the contract set forth in the second paragraph of the defendants' answer as exhibit 'A'?

" Ans. Yes.

" 10. Was the said defendant able and capable at such time of reading that instrument without extraordinary difficulty?

" Ans. Yes.

" 11. Did said defendant, at the time of signing said note or during said transaction, execute an order for one or more of the aforesaid machines, as he hath in the second paragraph of his answer alleged, and is it the same order which is referred to in the first paragraph of the reply as exhibit 'A'?

" Ans. Yes.

12. Would a slight and casual examination of the said note and the said order for machines, as to their general appearance, their arrangement, and style, have enabled the defendant to know, at the time of signing the said note, that it was not a duplicate of said order, provided he had given said instrument such an examination as aforesaid?

" Ans. No.

" 13. What is the amount of the principal and interest of the said note sued on herein?

" Ans. Five hundred and twenty-eight dollars and thirty-four cents.

" 14. What is a reasonable fee for plaintiffs' attorney for the collection of said note?

" Ans. Fifty dollars."

Upon the return of the verdict with the answers to interrogatories, the plaintiffs moved the court for judgment in their favor upon the answers to interrogatories, notwithstanding the general verdict, but this motion was overruled, and judgment rendered for the defendant Cutsinger, to which ruling the plaintiffs excepted.

On appeal to the general term, the proper assignment of error being made, the judgment at special term was affirmed.

In this court, the decision below at general term is properly assigned as error.

The sole question presented by the record is, whether the plaintiffs were entitled to judgment, on the answers of the jury to the interrogatories, against the defendant Cutsinger.

" When the special finding of facts is inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly." 2 G. & H. 206, sec. 337.

We may observe that the evidence in the cause is not before us, and if it were, we could not refer to it for aid in the solution of the question presented. We must determine from the general verdict and the special finding of facts, unaided by the evidence, which party is entitled to judgment.

The note in question is governed by the law merchant, being payable at a specified bank in this State. The special findings settle the propositions, that the defendant Cutsinger signed it, and that the plaintiffs purchased it for a valuable consideration before due, and without notice of any defence thereto. The plaintiffs therefore must be regarded as the *bona fide* holders of the paper and entitled to all legal rights as such holders of that class of paper.

The important and, so far as we can see, the only important fact found for the appellee Cutsinger, by the general verdict, is, that he was induced to sign the paper which proved to be the note in question, by the fraudulent acts of the agent of the payee in reading it to him as a duplicate order for one of the machines, and in otherwise inducing him to believe it was such an order as is set out in the paragraph of answer. But it is found by the answer to the fourth interrogatory, that the defendant, at the time he executed the note, was able to read the same. It is also found by the answer to the ninth interrogatory, that at the time of the signing of the note, or during the transaction, the defendant executed the contract set out as an exhibit to the second paragraph of the answer. This contract, it will be seen, recites as one of its conditions the giving of a note corresponding with that in suit as to time and amount, for the lease and a machine to be shipped. The jury also found, in answer to the sixth interrogatory, that there was contained in the body of this contract a statement sufficient to

advise any one who read the instrument that a note was being given, or that one of the instruments which was being or had been executed in said transaction was a note answering the description of that sued on as to date, time, and amount. It is also found that the defendant was capable of reading this contract without extraordinary difficulty, and that he did read it in part. It is further found by the answer to the twelfth interrogatory, that a slight and casual examination of the note and the order for machines, as to their general appearance, their arrangement, and style, would not have enabled the defendant to know, at the time of signing the note, that it was not a duplicate of the order.

The facts, as gathered from the general verdict and the special findings, may be summarized as follows:

The defendant was induced to sign the note by the fraud of the agents of the payee thereof, in reading it to him as a duplicate order for one of the machines, and otherwise making him believe it was such order. But as a part of the same transaction, the defendant executed the contract above set out as part of the pleadings, reciting the giving of a note corresponding with the one sued on. The defendant could read the note and contract without extraordinary difficulty, and did read the contract in part. But a slight and casual examination of the note and the order for the machine, as to their general appearance, arrangement, and style, would not have enabled the defendant to know that the note which he signed was not a duplicate of the order for one of the machines. The question arises, whether on these facts the defendant is liable on the note to the plaintiffs, they being the holders thereof as hereinbefore stated; and we are of opinion that he is so liable.

In an action on a delivery bond, involving no question upon commercial paper, where it was alleged that the constable had fraudulently misstated the contents of the bond in respect to the time when the property was to be delivered, and the defendant, relying upon the representations, without having the bond read, executed the same, and by the representation was

prevented from delivering the property at the time specified in the bond, this was held to be no defence.  The court said:

"It does not appear that the defendant was deceived by the representations made to him, or if he was, it is manifest that it was the consequence of his own folly.  If the defendant were an illiterate man, and the bond had been misread to him, he not being able to detect the imposition, the case would have been different.  But it appears that he signed the bond without reading it himself, or hearing it read, and with all the means of knowing the truth in his power, reposed a blind confidence in representations not calculated to deceive a man of ordinary prudence and circumspection.  In such a case the law affords no relief." *Seeright* v. *Fletcher*, 6 Blackf. 380.  See, also, *May* v. *Johnson*, 3 Ind. 449, and *Rogers* v. *Place*, 29 Ind. 577.  These authorities, while they are not exactly in point here, have a bearing upon the question involved.

In the case of *Cline* v. *Guthrie*, 42 Ind. 227–236, the law, as applicable to cases like the present, is stated in the following terms:

"It is well settled by authority and on principle, that the party whose signature to a paper is obtained by fraud as to the character of the paper itself, who is ignorant of such character, and has no intention of signing it, and who is guilty of no negligence in affixing his signature, or in not ascertaining the character of the instrument, is no more bound by it than if it were a total forgery, the signature included."

To this proposition several authorities are cited, which will be noticed hereafter.  We see no reason to change the statement of the law as thus made.  It will be seen that by the law as thus stated, in order to exonerate a party where his signature has been thus fraudulently obtained, he must have been guilty of no negligence in affixing his signature, or in not ascertaining the character of the instrument signed by him.  Within the last few years a number of cases have been decided involving questions very similar to that under consideration.  The case of *Walker* v. *Ebert*, 29 Wis. 194, from the opinion in which an extended extract is made in the case of *Cline* v.

*Guthrie, supra,* was one where the party sought to be held was a German by birth and education, and unable to read and write the English language. The case is therefore clearly distinguishable from that under consideration. The case of *Douglass* v. *Matting,* 29 Iowa, 498, was much like the present, and the maker of the note was held liable. The court said: " As between the *bona fide* holder, receiving the paper before due for value, and the maker, the equities are all on the side of the first. The maker puts his genuine signature to a note appearing upon its face fair and regular. In the regular course of business it comes into the hands of an innocent party, who has paid a valuable consideration for it and has no notice of any infirmities or defences attaching to the paper. Now it would be manifestly unjust to permit the maker while admitting the genuineness of his signature, to defeat the note, on the ground that, through his own culpable carelessness while dealing with a stranger, he signed the instrument without reading it or attempting to ascertain its true contents. The law will favor, as between the holder and maker in such a case, the more innocent and diligent. The maker had it in his power to protect himself from the fraud, but failed to do so. When the consequences of his act are about to be visited upon him, he seeks to make another bear it, on the ground that he was defrauded through his own gross negligence. He can certainly claim protection neither on the ground of his innocence nor diligence."

In a note to the Wisconsin case, prepared by the judge who delivered the opinion therein, it is said that the Iowa case is not in conflict with that, inasmuch as in the Iowa case there was culpable carelessness and gross negligence in affixing the signature to the instrument.

The following extract from the syllabus of the case of *Gibbs* v. *Linabury,* 22 Mich. 479, will sufficiently show what was decided in that case : " When the defendant unwittingly signs an instrument in the form of a negotiable promissory note, relying upon false representations made to him, at the time, that the instrument he is signing is a mere duplicate of a con-

tract just previously signed by him, making him an agent for the sale of a patent hay-fork, under circumstances devoid of any negligence on his part, and where fraudulent means are taken to prevent him from noticing the body of such pretended duplicate, and he delivers the same in ignorance of its true character, believing it to be the mere duplicate contract which he supposed he had signed, such instrument is to be regarded as a forgery, and cannot be enforced even in the hands of a *bona fide* purchaser." It would seem from this, that in the opinion of the court, if the defendant was himself guilty of any negligence, he would not be exonerated.

In the case of *Briggs* v. *Ewart*, 51 Mo. 245, it was held, that the following instruction should have been given:

"Although the court should find from the evidence that the defendant did write his name on or to the paper herein sued upon, yet if the court further finds from the evidence that the signature of defendant was obtained thereto without the fault or negligence of defendant, on the fraudulent representations of the payee that the paper to which it was put was a mere duplicate of the order read in evidence, and that the defendant neither knew it was a note, nor intended to sign a note, but supposed it was such a duplicate, and that the plaintiff did not pay therefor a full and valuable consideration, then the court will find the issues for the defendant."

The case of *Foster* v. *Mackinnon*, Law Rep. 4 C. P. 704, was amongst the earliest cases involving similar questions. There, the defendant was induced to put his name upon the back of a bill of exchange by the fraudulent representation of the acceptor that he was signing a guarantee. In an action against him as indorser by a *bona fide* holder for value, the jury were directed, that "if the defendant's signature to the document was obtained upon a fraudulent representation that it was a guarantee, and the defendant signed it without knowing it was a bill, and under the belief that it was a guarantee, and if he was not guilty of any negligence in so signing the paper, he was entitled to the verdict." This was held a proper direction.

It is worthy of observation that a verdict for the defendant

was set aside, and a new trial granted, on the ground that the court thought the question. of the defendant's negligence should undergo a further investigation.

In the case of *Whitney* v. *Snyder*, 2 Lansing, 477, the defendant offered to prove that he was unable to read, and that when he signed the note sued on it was represented to him, and he believed that it was a certain other contract, offered to be also produced in evidence, and which purported to be a contract *inter partes*, of an entirely different description. This evidence was rejected, and the rejection was held to be erroneous.

This case, like the one above cited from Wisconsin, has but little bearing upon the question here, as in both those cases the parties sought to be held could not read the instruments signed by them respectively.

The following extract from the opinion of the court in the case of *Taylor* v. *Atchison*, 54 Ill. 196, 199, will show the views of that court upon a very similar case :

" It is, however, necessary that a person executing such an instrument, which is procured by fraud or circumvention, should use reasonable and ordinary precaution to avoid imposition, when the suit is by an endorsee before maturity. If able to read readily, he should examine the instrument, or procure it to be read by some one in whom he can place confidence. If he is unable to read, or does so with difficulty, then he may avail himself of the usual means of information, by having it read by some person present. He cannot act recklessly, and disregard all the usual precautions to learn the contents of the instrument, and then interpose the defence against an assignee. As to the payee, it may be otherwise. Did appellee use ordinary precaution ? It appears to us that he did. He could read the writing with much difficulty, and being assured that it was a contract in which he incurred no liability, he desired it read, which was done, and was then assured that the other paper was a copy of that which had been read. While this may not be the precaution which would have been observed by an unusually cautious man, still, we think he acted as the great mass of men not in, or educated to, business act in such cases.

And he was only required to use reasonable caution, such as governs the majority of prudent men."

The most recent case upon this subject that has come to our notice is that of *Chapman* v. *Rose,* decided by the New York Court of Appeals, not yet reported in the regular series, but found in 1 Cent. Law Jour. 242. The case below will be found in 44 How. Pr. 364. The case is almost identical with that in judgment. We extract the following statement of it:

" The evidence tended very strongly to show that the signature of the defendant to the note sued on was obtained from him through a very gross and fraudulent imposition perpetrated upon him by one Miller; that when he signed it he supposed he was signing a paper of a very different character, and not an engagement to pay money absolutely. He had just before signed an order for the delivery to himself of a hayfork and two grappling pulleys, amounting together in price to nine dollars, for which he engaged to pay, and this paper now in suit was presented to him as a duplicate of that order, and was signed as such without examination or reading it, upon the statement of Miller, with whom he was dealing, that such was its character. There does not appear to have been any physical obstacle to the defendant's reading the paper before he signed it. He understood that he was signing a paper by which he was about to incur an obligation of some sort, and he abstained from reading it. He had the power to know with certainty the exact obligation he was assuming, and chose to trust to the integrity of the person with whom he was dealing, instead of exercising his own power to protect himself. It turns out that he has signed a promissory note, and that it is now in the hands of a holder in good faith for value."

The court proceeds further, in relation to the law as applicable to the case, as follows:

" The question which arises on the branch of the charge now under consideration is, whether it is enough as against a

*bona fide* holder to show that he did not know or suppose that he was signing a note, unless it also appears that he was guilty of no *laches* or negligence in signing the instrument.     *     * It is quite plain, that if the law is that no such inquiry is admissible, a serious blow will have fallen upon the negotiability of paper—it will be a premium offered to negligence. To insure irresponsibility, only the utmost carelessness, coupled with a little friendly fraud, will be essential.     Paper in abundance will be found afloat, the makers of which will have no idea that they were signing notes, and will have trusted readily to the assurance of whoever procured it that it created no obligation.     To avoid such evils it is necessary, at least, to hold firmly to the doctrine that he who by his carelessness or undue confidence has enabled another to obtain the money of an innocent person, shall answer the loss.     If it be objected, that there must be a duty of care in order to found an allegation of negligence upon the neglect of it, it must be answered, that every man is bound to know that he may be deceived in respect to the contents of a paper which he signs without reading.     When he signs an obligation without ascertaining its character and extent, which he has the means to do, upon the representation of another, he puts confidence in that person, and if injury ensues to an innocent third person by reason of that confidence, his act is the means of the injury and he ought to answer to it."

After noticing the cases of *Foster* v. *Mackinnon*, *Whitney* v. *Snyder*, *Douglass* v. *Matting*, *supra*, and *Putnam* v. *Sullivan*, 4 Mass. 45, the court say : " In all these cases, the real ground of decision is, not that the party meant to make a promissory note, but that, meaning to make an obligation in writing, and which was put in writing that it might of itself import both the fact and the form and measure of obligation, he trusted to another to fix that form and measure, without exercising that supervision that was in his power, and by which protection was possible.     In such cases, the rule is that he is bound by the act of him who has been trusted, in favor of a holder in good faith."

The cases on this subject may not all be reconcilable in every respect, but they generally recognize the liability of a party who has thus put his name to paper, in favor of *bona fide* holders, where he has been guilty of negligence in not ascertaining the character of the paper. There is probably some diversity of opinion as to what amounts to negligence.

We agree with the Court of Appeals of New York and the Supreme Court of Iowa, that where a man who can, without difficulty, read, executes a paper without reading it, trusting to the party to whom it is executed for a statement of its contents, or trusting to the reading of it by the latter, there being no substantial reason shown for not reading it himself, is guilty of negligence.

In this case, the defendant signed a paper which he supposed to be, and which was read to him as, a duplicate order for one of the machines. It turned out to be the note in suit. He could read without extraordinary difficulty, and did read a part of the contract executed concurrently with the note, and which recited the giving of the note. In signing the paper, he trusted to the statements of the agent of the payee as to the character and contents of the instrument, without exercising the means then within his power of knowing what it was that he was signing. A promissory note is a short document and soon read. By thus signing it without knowing its contents, he enabled the payee to obtain the money of the plaintiffs, and he cannot now be permitted to say that it is not his note.

It would seem that at common law a party could not successfully plead *non est factum* where he had been deceived and the deed wrongly read to him, unless he was illiterate, and therefore unable to read it himself; for, in *Thoroughgood's Case*, 2 Rep. 9, it was resolved, " that although the party to whom the writing was made, or other by his procurement, doth not read the writing, but a stranger of his own head read it in other words than in truth it is, yet it shall not bind the party who delivereth it; for it is not material who readeth the writing, so as he who maketh it be a layman, and being not lettered, be (without any covin in himself) deceived; and that

is proved by the usual form of pleading in such cases, that is to say, that he was a layman and not learned, and that the deed was read to him in other words, etc., generally, without showing by whom it was read."

It is hardly to be conceived at the present day, that a person able to read, who has executed a conveyance of land without reading it, but trusting to the reading thereof by the grantee, who for a fraudulent purpose read it wrongfully, could successfully claim that it was not his deed, as against a subsequent purchaser in good faith of the land from his grantee. The analogy between the rights of such purchaser in good faith, and those of the holder in good faith of commercial paper, is strong.

We are of opinion that the plaintiffs below were entitled to judgment against the defendant and Cutsinger, notwithstanding the general verdict, and that the court below, at general term, erred in affirming the judgment rendered at special term.

The judgment below is reversed, with costs, and the cause remanded for further proceedings in accordance with this opinion.